UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

CARLANDA ANTHONY,              )
                                     )
         Plaintiff,          )
                                     )
          v.              )     CASE NO. 1:10-cv-00136-DML-JMS
                                     )
MICHAEL J. ASTRUE,         )
                                     )
         Defendant.     )

# Decision on Judicial Review

Plaintiff Carlanda Anthony applied, on September 29, 2004, for Supplemental Security Income disability benefits (SSI) under Title XVI of the Social Security Act, alleging that she has been disabled since June 1, 2004, because of mental impairments. Acting for the Commissioner of the Social Security Administration following a hearing on November 15, 2007, an administrative law judge ("ALJ") found that Ms. Anthony was not disabled. The National Appeals Council denied review of the ALJ's decision, rendering the ALJ's decision for the Commissioner final. Ms. Anthony filed this civil action under 42 U.S.C. § 405(g) for review of the Commissioner's decision.[1]

Ms. Anthony challenges the ALJ's step three conclusion that her mental and physical impairments do not satisfy listing 12.05C, which describes a severity of mental retardation that is presumptively disabling. The ALJ found that listing 12.05 was not applicable to Ms. Anthony based on his finding—in a footnote—that the record "fails to show any deficits in the claimant['s] adaptive functioning (she cares for children; drives; shops; and cooks) so that she

---

[1]      The parties consented to the magistrate judge conducting all proceedings and ordering the entry of judgment in accordance with 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73.

does not even initially meet the diagnostic description in the introductory paragraph of Listing 12.05." (R. 17 n. 2).

For the reasons discussed below, the Commissioner's decision is remanded for reconsideration consistent with this decision.

## Standard for Proving Disability

To prove disability for purposes of SSI benefits, a claimant must show that she is unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382c(a)(3)(A). Ms. Anthony is disabled if her impairments are of such severity that she is not able to perform the work she previously engaged in and, if based on her age, education, and work experience, she cannot engage in any other kind of substantial gainful work that exists in significant numbers in the national economy. 42 U.S.C. § 1382c(a)(3)(B). The Social Security Administration ("SSA") has implemented these statutory standards by, in part, prescribing a five-step sequential evaluation process for determining disability. 20 C.F.R. § 404.1520.

Step one asks if the claimant is currently engaged in substantial gainful activity; if she is, then she is not disabled. Step two asks whether the claimant's impairments, singly or in combination, are severe; if they are not, then she is not disabled. A severe impairment is one that "significantly limits [a claimant's] physical or mental ability to do basic work activities." 20 C.F.R. § 404.1520(c). The third step is an analysis of whether the claimant's impairments, either singly or in combination, meet or equal the criteria of any of the conditions in the Listing of Impairments, 20 C.F.R. Part 404, Subpart P, Appendix 1. The Listing of Impairments are medical conditions defined by criteria that the SSA has pre-determined are disabling, so that if a

claimant meets all of the criteria for a listed impairment or presents medical findings equal in severity to all the criteria for the most similar listed impairment, then the claimant is presumptively disabled and qualifies for benefits. *Sims v. Barnhart,* 309 F.3d 424, 428 (7th Cir. 2002).

If the claimant's impairments do not satisfy a listing, then her residual functional capacity (RFC) is determined for purposes of steps four and five. RFC is a claimant's ability to do work on a regular and continuing basis despite her impairment-related physical and mental limitations. 20 C.F.R. § 404.1545. At the fourth step, if the claimant has the RFC to perform her past relevant work, then she is not disabled. The fifth step asks whether there is work in the relevant economy that the claimant can perform, based on her age, work experience, and education (which are not considered at step four), and her RFC; if so, then she is not disabled.

The individual claiming disability bears the burden of proof at steps one through four. *Bowen v. Yuckert,* 482 U.S. 137, 146 n.5 (1987). If the claimant meets that burden, then the Commissioner has the burden at step five to show that work exists in significant numbers in the national economy that the claimant can perform, given her age, education, work experience, and functional capacity. 20 C.F.R. § 416.960(c)(2); *Young v. Barnhart,* 362 F.3d 995, 1000 (7th Cir. 2004).

## Standard for Review of the ALJ's Decision

Judicial review of the Commissioner's (or ALJ's) factual findings is deferential. A court must affirm if no error of law occurred and if the findings are supported by substantial evidence. *Dixon v. Massanari,* 270 F.3d 1171, 1176 (7th Cir. 2001). Substantial evidence means evidence that a reasonable person would accept as adequate to support a conclusion. *Id.* The standard

demands that there be more than a scintilla of evidentiary support, but does not demand a preponderance of the evidence. *Wood v. Thompson,* 246 F.3d 1026, 1029 (7th Cir. 2001).

The ALJ is required to articulate a minimal, but legitimate, justification for his decision to accept or reject specific evidence of a disability. *Scheck v. Barnhart,* 357 F.3d 697, 700 (7th Cir. 2004). If an ALJ concludes that benefits should be denied, he must have first built an accurate, logical bridge between the evidence and his conclusion. *Berger v. Astrue,* 516 F.3d 539, 544 (7th Cir. 2008). The ALJ need not address every piece of evidence in his decision, but he must trace the path of his reasoning and connect the evidence to his findings and conclusions. *Clifford v. Apfel,* 227 F.3d 863, 872 (7th Cir. 2000).

### Analysis

The parties agree, and the court finds, that this case turns on whether substantial evidence supports the ALJ's conclusion that Ms. Anthony did not meet the first requirement of listing 12.05C— significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period.

Ms. Anthony does not assert error in the ALJ's assessment of her intellectual and adaptive functioning for purposes of his residual functional capacity finding. But Ms. Anthony's RFC—considered at steps four and five—is irrelevant if at step three her impairments satisfy listing 12.05C. *See Sims v. Barnhart,* 309 F.3d 424, 428 (7th Cir. 2002) (when claimant meets all of the criteria for a listed impairment, then the claimant is presumptively disabled and qualifies for benefits). The Commissioner's arguments that the ALJ properly analyzed evidence relevant to Ms. Anthony's mental capacity for purposes of deciding functional restrictions are therefore beside the point. *See also King v. Barnhart,* 2007 WL 968746 at *4 (S.D. Ind. Feb. 26, 2007) (12.05C's standards are designed to address situation where combination of low mental

ability and another significant mental or physical impairment impede ability to work; "[i]ts standards are designed to identify cases in which more detailed, individualized consideration of a claimant's situation is not justified").

The issue for appeal is thus whether the ALJ's determination at step three that Ms. Anthony does not satisfy listing 12.05C is supported by substantial evidence. We find that it is not.

**A.** **The record demonstrates that Ms. Anthony suffers from some deficits in adaptive functioning.**

Listing 12.05C states:

> 12.05 *Mental retardation.* Mental retardation refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period, *i.e.,* the evidence demonstrates or supports onset of the impairment before age 22.
>
> The required level of severity for this disorder is met when the requirements in A, B, C, or D are satisfied. . . .
>
> * * *
>
> C. A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function.

The ALJ's entire step three analysis regarding listing 12.05C consists of a single footnote. In that footnote, he concluded that Ms. Anthony does not meet the diagnostic description in the introductory paragraph of 12.05 because she has *no* deficits in adaptive functioning, as evidenced by her abilities to care for her children, drive, shop, and cook. (R. 17 n.2). But the record does not support the ALJ's conclusion that Ms. Anthony has *no* deficits in adaptive functioning, and indeed his opinion acknowledges that Ms. Anthony has at least moderate limitations in social functioning and in her ability to maintain concentration, persistence, or pace "given her mild mental retardation diagnosis." (R. 17). As to concentration, persistence, or pace, the ALJ

concluded, based on all "the evidence together," that Ms. Anthony "does have problems in this area." (*Id.*).

Further, as the Commissioner acknowledges, the ALJ cited in other sections of his decision the results of testing and evaluation of Ms. Anthony's mental capacities performed by a psychologist (Dr. Bob Hatfield) to whom Ms. Anthony was referred by her family doctor before she applied for disability benefits. Dr. Hatfield's report, which the ALJ did not discount or criticize, opined that Ms. Anthony suffers from "significant neuropsychological impairments of memory, reading, expressive and receptive language, numerical reasoning skills, problem solving, as well as depression and anxiety." (*See* R. 16, ALJ's recitation of Dr. Hatfield's findings, and R. 137-142, Dr. Hatfield's report). A report by the state examining psychological, Dr. Ceola Berry, also recites findings consistent with deficits in adaptive functioning. (R. 176-179).

Because there is unrefuted evidence in the record that Ms. Anthony suffers from some deficits in adaptive functioning, the ALJ's decision to reject listing 12.05C on the grounds that Ms. Anthony has *no* such deficits cannot be sustained.

**B.** <u>**The court cannot affirm the ALJ's decision on a ground he did not articulate.**</u>

The Commissioner contends that even if Ms. Anthony suffers from some adaptive deficits, the evidence before the ALJ did not show that those deficits initially manifested themselves in the developmental period before age 22, and the ALJ's conclusion that listing 12.05C was not met can be affirmed on this basis. The court disagrees. First, an ALJ's decision is tested based on the grounds the ALJ used to support his decision, not on other grounds that the ALJ theoretically also could have chosen. *See SEC v. Chenery Corp.,* 332 U.S. 194, 196 (1947) (Agency decision is judged "solely by the grounds invoked by the agency. If those grounds are inadequate or improper, the court is powerless to affirm the administrative action by substituting what it

considers to be a more adequate or proper basis").  Second, the record contains evidentiary support for a conclusion that Ms. Anthony's adaptive deficits manifested themselves before she turned 22 years old.

The Commissioner emphasizes the ALJ's observations that Ms. Anthony's educational record did not reflect special education classes, and that she gave inconsistent information in her disability paperwork whether she ever was enrolled in special education classes.  Enrollment in special education classes is one way a claimant can show that her subaverage intellectual functioning and deficits in adaptive functioning manifested themselves before age 22, *see Hendricks v. Astrue,* 2009 WL 648610 at *5-6 (S.D. Ind. March 11, 2009), but it does not follow that lack of special education classes requires the opposite conclusion:  that there was no manifestation before age 22.

Here, the ALJ did not attempt to resolve the discrepancies in the record whether Ms. Anthony attended special education classes or not.  At the hearing, Ms. Anthony testified that she believed she was in special education classes in the ninth and tenth grades.  (R. 606-07).  She (or her aunt) reported to Dr. Hatfield (before filing for SSI disability benefits) that in school Ms. Anthony "received services in the learning disabilities program."  (R. 139).  The record also reflects Ms. Anthony's aunt's statement to the state's consultative examiner that Ms. Anthony "was in special education ever since elementary school . . . she had a tutor and she also had to go to a special room to get other help during the day."  (R. 178).  Even though Ms. Anthony's school record does not contain a reference to special education classes, the school record reflects significant shortcomings in Ms. Anthony's education—which may indeed be indicative of adaptive functioning deficits before age 22.

The school record—a one-page document—at least reflects that Ms. Anthony received something other than a "regular" high school education and that her school did not demand much of her. (*See* R. 186). The record shows that in ninth grade, Ms. Anthony took six classes the first semester but in the second semester took two classes only—reading (for which she received a C grade) and home economics/foods (for which she received a C grade)—and that she withdrew from math, physical education, basic biology, and home economics/clothing. In tenth grade, Ms. Anthony took six classes the first semester—three of which were home economics courses, one was physical education, and the other two were reading and math. Ms. Anthony had no grades for any classes the second semester of tenth grade, and she had no further education. Despite having taken reading classes for three semesters in high school (and presumably reading classes in grade school), Ms. Anthony reads at the third-grade level. (R. 140). Her daughter and sister helped her fill out disability forms, including by reading the questions to Ms. Anthony (R. 82, 97). And despite education in math through the middle of tenth grade, Ms. Anthony's math skills similarly are woefully substandard, as reflected in testing by Dr. Hatfield (R. 137 (noting "significant impairment" on Arithmetic Scale) and consultative examiner Dr. Ceola Berry (R. 177, noting rapid completion in reciting serial threes but with seeming unawareness of the inaccuracies).

In summary, Ms. Anthony's school record, other evidence regarding her schooling, along with the evaluations by Drs. Hatfield and Berry and their clinical conclusions, all supply evidence that would support a finding that Ms. Anthony's deficits in adaptive functioning manifested themselves before age 22.

**C.**     __The ALJ should consider a wide variety of areas of adaptive functioning.__

The ALJ's findings that Ms. Anthony is capable (as an adult, at least) in some areas of adaptive functioning is not conclusive whether she suffers in other areas relevant to listing 12.05C. The Social Security Administration explained in 2002 that its definition of mental retardation expressed in 12.05C is consistent with, although not identical to, the definitions used in the relevant medical profession, and that measurement methods used in the medical profession are appropriate in analyzing whether a claimant meets the listing. SSA stated that:

> The four major professional organizations in the United States that deal with [mental retardation] have each established their own definition of [mental retardation.] While all the definitions require significant deficits in intellectual functioning, [as evidenced by certain IQ scores], age of onset and the method of measuring the required deficits in adaptive functioning differ among the organizations. . . . The definition of [mental retardation] used by SSA in the listings is not restricted to diagnostic uses alone, nor does it seek to endorse the methodology of one professional organization over another. While capturing the essence of the definitions used by the professional organizations, it also is used to determine eligibility for disability benefits. SSA's definition establishes the necessary elements, while allowing use of any of the measurement methods recognized and endorsed by the professional organizations.

*See Technical Revisions to Medical Criteria for Determinations of Disability,* 67 Fed. Reg. 20018-01 (April 24, 2002). As Ms. Anthony points out, the American Psychiatric Association defines deficits in adaptive functioning as "deficits or impairments . . . in at least two of the following areas: communication, self-care, home living, social/interpersonal skills, use of community resources, self-direction, functional academic skills, work, leisure, health, and safety." *See Hayes v. Commissioner,* 357 Fed. Appx. 672, 677 (6th Cir. 2009) (citing the APA's *Diagnostic and Statistical Manual of Mental Disorders*, 4th rev. ed (DSM-IV)). Ms. Anthony's abilities to cook and care for her children (with help), take care of her personal hygiene, drive, and shop do not cover all the relevant areas. *See also Mendez v. Barnhart,* 439 F.3d 360 (7th Cir.

2006) (cautioning "against placing undue weight on a claimant's household activities in assessing the claimant's ability to hold a job outside the home").

For example, as discussed above, there is evidence of significant impairment of Ms. Anthony's functional academic skills, particularly as described by Dr. Hatfield in his report. (R. 137-142). Among other things, Dr. Hatfield found that Ms. Anthony had significant impairments in arithmetic and visual and auditory memory functions, and moderate impairments in reading, writing, and problem solving skills. The results of Dr. Hatfield's IQ testing placed Ms. Anthony in the category of mildly mentally handicapped[2]—testing that, in the absence of contrary evidence, is presumed to reflect a life-long condition. *See Guzman v. Brown,* 801 F.2d 273, 275 (7th Cir. 1986) (in the absence of evidence otherwise, a person's IQ score later in life correctly reflects IQ score early in life); *Hendricks v. Astrue,* 2009 WL 648610 at *5-6 (S.D. Ind. March 11, 2009) (listing's requirement of manifestation of deficits in functioning before age 22 does not require affirmative proof of testing before age 22; evidence of current functioning may demonstrate or support that deficits initially manifested themselves before age 22).

There is evidence (as shown by the reports of Drs. Hatfield and Berry, self-reports by Ms. Anthony in connection with mental health services, and the observations by Ms. Anthony's aunt and boyfriend) of Ms. Anthony's difficulties in communication and interpersonal and other social skills, which may have initially manifested themselves before age 22. Ms. Anthony's

---

[2]    The opinion by Dr. Neville, the non-examining state physician, that Ms. Anthony may suffer from borderline intellectual functioning instead of mental retardation does not mean listing 12.05C is not satisfied. A formal diagnosis, or lack thereof, of mental retardation is not the touchstone. *See Hendricks v. Astrue,* 2009 WL 648610 at *7 n.2 (S.D. Ind. 2009 March 11, 2009) (listing 12.05C does not require a formal diagnosis of mental retardation). As noted *supra* at page 9, "[t]he definition of mental retardation used by SSA in the listings is not restricted to diagnostic uses alone, nor does it seek to endorse the methodology of one professional organization over another." (citing *Technical Revisions to Medical Criteria for Determinations of Disability,* 67 Fed. Reg. 20018-01 (April 24, 2002).

work history (or lack thereof) also may be indicative of functional deficits. Ms. Anthony testified that she had been fired from a number of jobs because she was too slow (*see* R. 608-610), which is consistent with Dr. Hatfield's findings that Ms. Anthony is functionally limited in her ability to process information and has slow response times. (R. 141). Her work history is sparse, which is consistent with the inability to maintain a job. She earned around $1,500.00 per year from 1994 through 1997, nothing in 1998, $695.00 in 1999, less than $500.00 per year in 2000 through 2004, and nothing since then. (R. 51). *See, e.g., Pedro v. Astrue,* 2011 WL 1100214 at *5 (D. Or. March 23, 2011) (noting claimant's history of low-skilled work and difficulties staying on task and at pace).

This evidence, and other evidence in the record, must be examined by the ALJ on remand as part of his determination whether Ms. Anthony meets the requirement of the introductory paragraph of listing 12.05C of "deficits in adaptive functioning initially manifested during the developmental period, *i.e.,* the evidence demonstrates or supports onset of the impairment before age 22."

### D.      Ms. Anthony has met the other requirements of listing 12.05C.

The court notes that other than the open issue whether Ms. Anthony has deficits in adaptive functioning that initially manifested themselves before age 22, Ms. Anthony proved (and the Commissioner does not contest) that she satisfied the other elements of listing 12.05C. That is, she has an IQ score that fits the listing, and she suffers from a severe impairment in addition to her subaverage intellectual functioning.

Dr. Bob Hatfield administered the Wechsler Adult Intelligence test to Ms. Anthony in September 2004, and she scored a Verbal IQ of 66, a Performance IQ of 74, and a Fullscale IQ of 67—thus meeting that portion of 12.05C requiring "a valid verbal, performance, or full scale

11

IQ of 60 through 70." (R. 137-142). The Commissioner does not challenge these results. Indeed, Dr. Hatfield remarked that "[i]t is important to note that Ms. Anthony did not appear to be malingering, but she did appear to be performing to the best of her ability." (R. 140). There is no indication that Ms. Anthony's IQ scores as an adult are not reflective of her IQ scores in the developmental period (before age 22). *See Guzman v. Bowen,* 801 F.2d 273, 275 (7th Cir. 1986) (in the absence of evidence otherwise, a person's IQ score later in life is indicative of her life-long condition).

The test scores satisfy both the IQ score requirement in subparagraph C as well as provide evidence of "significantly subaverage general intellectual functioning . . . initially manifested during the developmental period," to meet the requirement in the introductory paragraph of 12.05. *See Technical Revisions to Medical Criteria for Determinations of Disability,* 67 Fed. Reg. 20018-01 (Apr. 24, 2002) (DSM-IV states that "essential feature of mental retardation is significantly subaverage general intellectual functioning (further defined as an IQ standard score of approximately 70 or below). . . .").

The ALJ found that Ms. Anthony suffered from severe impairments not related to her low intellectual functioning—thus meeting that portion of 12.05C requiring "a physical or other mental impairment imposing an additional and significant work-related limitation of function." The ALJ's step two analysis identified general anxiety disorder and depression as severe mental impairments, and right shoulder pain as a severe physical impairment. As "severe," these impairments by definition are ones that "significantly limit[] [Ms. Anthony's] physical or mental ability to do basic work activities." 20 C.F.R. § 404.1520(c).

## **Conclusion**

For the above reasons, the court REMANDS this matter to the Commissioner for rehearing, pursuant to 42 U.S.C. § 405(g) (sentence four), to evaluate whether Ms. Anthony meets the introductory paragraph of listing 12.05C.

So ORDERED.

Date:   07/12/2011

_Debra McVicker Lynch_
Debra McVicker Lynch
United States Magistrate Judge
Southern District of Indiana

Distribution:

Thomas E. Kieper
UNITED STATES ATTORNEY'S OFFICE
tom.kieper@usdoj.gov

Joseph W. Shull
jshull@joeshull.com